WAGNER TYPEWRITER CO. et al. v. F. S. WEBSTER CO.

(Circuit Court, S. D. New York. March 28, 1906. On Rehearing, April 16, 1906.)

No. 7,823.

1. TRADE-NAMES—USE—INFRINGEMENT.

Complainant manufactured and sold typewriter ribbons for the "Underwood" typewriter, the ribbons being contained in boxes bearing the words "Underwood Typewriter Copying Ink Ribbon manufactured only by J. Underwood & Co." Defendant also manufactured typewriter ribbons, using a star as a trade-mark and the words "The Webster Star brand," on its boxes, above which was the single word "Underwood." There was evidence that defendant's use of the word "Underwood" was solely to indicate that the box contained a ribbon of the proper size and on the appropriate spool for use in the Underwood typewriter, and not for the purpose of palming off its ribbons as of "Underwood" manufacture. *Held*, that defendant's use of the word was not unlawful.

2. PATENTS—DESIGN PATENTS—TYPEWRITER RIBBON SPOOLS.

The Manning design patent, No. 31,675, for a ribbon spool for typewriting machines is void; such a device not being a proper subject of a design patent.

3. SAME—INFRINGEMENT—RIBBON MECHANISM FOR TYPEWRITERS.

The Wagner patent, No. 650,438, for a ribbon mechanism for typewriters while it makes a ribbon spool an element of the combination does not make it a chief or vital part, but only an ordinary working part, nor is it singly a part of the invention, being common and necessary for all typewriters whether the patented mechanism is used or not. The spool not being patented, either singly or in combination with the ribbon, and being of trifling cost, is usually replaced when the frequent necessity arises for renewing the ribbon, and the owner of a machine equipped with the patented mechanism, being under no license restriction, may replace both ribbon and spool as a matter of repairs, without infringement of the patent, and a manufacturer, who sells the two together for such replacement, is not chargeable with contributory infringement.

[Ed. Note.—Contributory infringement of patents, see note to Edison Electric Light Co. v. Peninsular Light, Power & Heat Co., 43 C. C. A. 485.]

Suit in equity to restrain the defendant from infringing alleged trade-name or trade-mark "Underwood" by selling typewriter ribbons on spools contained in boxes having the name Underwood thereon, and from infringing two certain United States letters patent, viz.: Design patent, No. 31,675, issued October 17, 1899, to Edward J. Manning, assignor to Wagner Typewriter Company, for ribbon spool for typewriting machines, and mechanical patent, No. 650,438, issued May 29, 1900, to Herman L. Wagner and Franz X. Wagner for ribbon mechanism for typewriters.

Briesen & Knauth (Arthur V. Briesen, of counsel), for complainants.

Richardson, Herrick & Neave (Guy Cunningham, of counsel), for defendant.

RAY, District Judge. Complainants make and sell typewriters known as the "Underwood," also sell typewriter ribbons. John T. Underwood largely identified with complainant company makes the

typewriter ribbons known as "Underwood ribbons." Both the Underwood typewriter and the Underwood ribbons are extensively sold and used. In fact, are quite generally. in use. There are many other typewriters, and many other kinds of typewriter ribbons. Some of these ribbons are mounted on spools, and some are not. Some of the typewriters require a spool of a particular size, diameter, and width. This is true of the Underwood, but the same spool may be used in one or more of the other machines. The ribbons themselves may be handled and sold independent of and separated from the spools. The spools of thin metal are of little market value. On complainants' boxes of pasteboard containing its ribbons is printed "Underwood Typewriter Copying Ink Ribbon manufactured only by J. Underwood & Co." The word "Underwood" is not otherwise on the box. On complainants' box containing another ribbon, the Bar-Lock ribbon, is printed "Underwood's Bar-Lock Record Ink Ribbon manufactured only by J. Underwood & Co." On defendant's boxes containing its ribbons it has its trade-mark, a star. In large print the words "The Webster, Star brand," etc. Above this is the single word "Underwood." The evidence shows to my satisfaction that defendant used this word for the sole and only purpose of showing to its salesmen and to purchasers that the ribbon contained in the box was for use, or of the proper size and on the appropriate spool for use in the Underwood typewriter machine, and was not used for any fraudulent purpose, or with any fraudulent intent or to palm off its ribbons as of the Underwood manufacture.

The evidence of a sale and of alleged deceit is that one Anna Jaeger wrote defendant company as follows:

"For the inclosed three dollars ($3) kindly send me at your earliest convenience three 'Underwood ribbons,' (record,) and oblige.

"Yours truly,　　　　　　　　　　　　　　　　　　　Anna Jaeger."

She received three black record ribbons of defendant's make, accompanied with the following communication:

"We are in receipt of your letter of the 13th inst. also inclosure of $3, and are sending you by mail, under separate cover, three Black Record Ribbons for the Underwood machine."

It is true that when she wrote this firm for Underwood ribbons simply she got Black Record Ribbons for the Underwood machine. The language of her communication plainly indicated she wanted three record ribbons for use in an Underwood typewriter, and she got what she called for. She did not intimate she wanted ribbons of the Underwood make, and the reply does not intimate they were, but quite the contrary. The defendant had the right to use the name "Underwood" as it did if for the sole purpose of indicating that the ribbon was for use in an Underwood machine. "It is not the use, but dishonesty in the use, of the name that is condemned, and it is a question of evidence in each case whether there is false representation or not." Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U. S. 118–140, 25 Sup. Ct. 609, 49 L. Ed. 972. This branch of the case must fail.

As to the design patent it is void. Rowe v. Blodgett & Clapp Co.,

112 Fed. 61, 50 C. C. A. 120; Bradley v. Eccles, 126 Fed. 945–949, 61 C. C. A. 669. This metal spool is not designed for display, but for an obscure use, and there is no evidence it is ornamental or appeals to the eye or to purchasers and users of the machine as a thing of beauty. There is no evidence its design attracts purchasers. When in use, it cannot be seen by the user of the machine except as he or she bends forward and the bystander must bend over the machine or it is hid from view. It in no sense adds to the attractiveness of the machine as a whole.

The mechanical patent is said to be void, because of want of invention in view of the prior art. If not void, it is alleged there is no contributory infringement (that being the infringement alleged), for the reason that defendant is at liberty to make and sell ribbons wound on spools designed and manufactured for use in the Underwood typewriter machine. The contention is that the ribbon itself is no part of the patent, not an element of the claim, and that a spool goes in the trade generally with the ribbon, and is put in and discarded with it, being of trifling cost; and that as the ribbon is short lived, and requires frequent changes, the owner, being under no license restriction, may change that, putting in a ribbon of any make, as he pleases, and consequently is not obligated to put in a ribbon separate from a spool, but may put in any spool not patented having a ribbon by whomsoever manufactured, and that what the owner of the machine may do any third party may do, and hence defendant may manufacture and sell to the owner of an Underwood typewriter a ribbon spool, having thereon a ribbon (the ribbon being the main thing), of the special size required for that machine without being guilty of contributory infringement. Ribbon spools, or their equivalent, are an essential element of the typewriting machine. So is a ribbon. But neither the ribbons nor the spools in question here, nor a combination of them, are patented. The spools used in the Underwood typewriting machine are merely an element of the patented combination described in the mechanical patent in question. This is not a chief part of the combination nor a vital element thereof, but only an ordinary working part; one common to and necessary for all typewriting machines. Says the specifications of this patent, No. 650,438, as to what the invention is and its object:

"Our invention relates to ribbon mechanism for typewriters; and said invention consists in the novel arrangement and combination of parts to be hereinafter described and claimed. The object of the invention is to provide efficient means for supporting and operating the ribbon-spools in such a manner as to prevent the ribbon from escaping therefrom."

Then, after confessedly describing the general mechanism of the Underwood typewriter, and also the mechanism for rotating the spindles on which the spools are placed, the patentee says:

"Each of the ratchet-wheels 64 is connected to a spindle 67, which carries a bevel-gear 68, that meshes with a corresponding bevel-gear 69, which latter bevel-gear is connected to a suitably-mounted vertical or substantially-vertical spindle 70, that projects through a spool-casing 71 and is adapted to receive the spool 72 thereon. This spindle 70 has a flange 73 secured thereto, and from this flange projects a pin 74, that is adapted to engage in a corre-

sponding recess in the ribbon-spool, or other suitable means may be employed to form a connection between the spindle and the ribbon-spool in order to operate the same."

It will be observed that there is a projecting pin adapted to engage in a corresponding recess in the ribbon spool. There is nothing peculiar about this, but he says, to repeat, "or other suitable means may be employed to form a connection between the spindle and the ribbon spool in order to operate the same." The only office of this pin or nipple fitting into a hole in the spool is to prevent the turning of the spool on the spindle, to cause the spool to revolve with the spindle when the machine is in operation. Any spool of suitable size to go in the casing soon to be described and any "suitable means" for connecting the spool to the spindle may be employed. Nowhere is it suggested that the spool is to be of a peculiar size or of a peculiar specific construction in any of its parts.

Then comes the description of the casing for the spool to prevent the ribbon from dropping from the spool, as follows:

"The improved means for supporting the ribbon-spools to prevent the escape of the ribbon therefrom will now be described. It has been common heretofore to support ribbon-spools so that the laminæ or layers of ribbon will be vertically supported upon the spools, and should the ribbon become slack there would be a liability of the ribbon dropping from the spools. Special reference being had to Fig. 2 of the drawings, it will be seen that each of the ribbon-spools 72 is maintained centrally upon the spindle 70, to which it is secured and that below and partly surrounding the ribbon-spool is a casing 71, which is apertured, as indicated at 76, (see Figs. 3 and 4 of the drawings,) for the passage of a ribbon 77, and above the aperture 76 in the ribbon-spool casing projects a guide-finger 78, which prevents the ribbon from being withdrawn upwardly from the spool or casing during the operation of the machine, allowing, however, of the ready removal of the ribbon when the same is carried to a position which it does not normally have when the machine is in operation, as indicated in Fig. 3 of the drawings. It will be observed that by these means the ribbon is prevented from dropping off the spool, the casing acting as a guide for the ribbon in case of slack being had or there being a tendency to unwind. The outward limit of movement of the ribbon being controlled by the casing, a further operation of the machine will tend to take up the slack and automatically tighten and straighten the laminæ of ribbon on the spool. The ribbon is conveyed from spool to spool in any desired manner. In the present instance we have shown it as being conveyed to a ribbon-guide 79, which is likewise preferably provided with arms 80, that constitute a guide for the type-bars. The invention in this case is illustrated in connection with the well-known "Underwood" typewriting machine, though it should be understood that the invention may be applied to a typewriting machine of any well-known or preferred construction and that various changes in construction and arrangement may be made to adapt the invention to typewriting machines of different types."

Then comes the claim, viz.:

"In a typewriting machine, the combination with a pair of disconnected ribbon-spools of a casing for each of said spools secured against movement to the framing of the machine and each surrounding its spool circumferentially for at least a portion of the extent thereof, each of said casings being in the nature of an open-mouthed pocket in which its spool is adapted to rotate and from which said spool may be removed, a substantially-vertical spindle adapted to pass through the perforation in the bottom of each of said pocket-like casings, means for connecting a spool to rotate with each of said spindles and means controlled by the spacing mechanism for rotating said spindles in opposite directions."

As to the spools we have simply a pair of disconnected ribbon spools, an element, but a mere incidental element of the combination. Not a vital element, not a chief part thereof but an ordinary working part or a part upon which the ribbon is wound. In short the spool has a central opening, as do all spools, through which the spindle passes. The spindle has a flange with a short pin which enters a round hole in the spool a little to one side of the central opening. This connects it with the spindle. It may be done in other ways, expressly says the patent. Defendant made some spools specially adapted for use on this machine. Complainants expressly contend and say in the brief:

"The term 'ribbon spool' in the claim does not mean a spool without a ribbon, but one having a ribbon, and a spool is useless unless there is a ribbon connected with it, and the claim necessarily implies that the ribbon spools must contain a ribbon, or else the word ribbon before the word spools would be meaningless."

The complainants also contend that the owner of an Underwood typewriter infringes when he purchases for it a new ribbon wound on a spool not made by them and places it in the machine to replace the worn out ribbon. And as to this complainants say:

"But the defendant in so doing reconstructs an essential element of the Underwood machine and becomes, as we have already stated, a contributory infringer."

If complainants' contention is correct then every owner of an Underwood typewriting machine must purchase ribbons and spools of the complainants, and pay any price therefor they fix, and, as a result, complainants have not only a monopoly of the machine itself, but of the supplies, inked ribbons, that must be used with it, and this without any license restriction in the sale, and without a patent for the spool and ribbon in combination, or for either alone. This mode of creating monopolies has just been condemned by the Circuit Court of Appeals, Second Circuit (145 Fed. 933), even where there is a license restriction, in reversing Cortelyou v. Charles Eneu Johnson & Co. (C. C.) 138 Fed. 110. To sustain the contention of the complainants will, in effect, give them a monopoly, not only of the patented machine, but of an unpatented article, inked typewriter ribbon, now in common use, and as necessary to the general public as ink itself. Typewriters have come into general use in all business places and thousands of homes. This court is of opinion that under the well settled authorities the contention of the complainants must fail, and that contributory infringement has not been shown.

In Wilson v. Simpson, 9 How. (U. S.) 109, 13 L. Ed. 66, the court held:

"An assignee of a right to use a patented planing-machine, who has the right to continue the use of a particular machine after an extension of the term of the patent, according to the decision of this court in Wilson v. Rousseau, 4 How. 646 (11 L. Ed. 1141), may replace the knives when worn out, without destroying the identity of that particular machine. * * * But it does not follow, when one of the elements of the combination has become so much worn as to be inoperative, or has been broken, that the machine no longer exists, for restoration to its original use, by the owner who has

bought its use. When the wearing or injury is partial, then repair is restoration, and not reconstruction. * * * Nothing is gained against our conclusion by its being said that the combination is the thing patented, and that, when its intended result cannot be produced from the deficiency of a part of it, the invention in the particular machine is extinct. It is not so. Consisting of parts, its action is only suspended by the want of one of them, and its restoration reproduces the same result only, without the machine having been made anew. Of course, when we speak of the right to restore a part of a deficient combination, we mean the part of one entirely original, and not of any other patented thing which has been introduced into it, to aid its intended performance. * * * The right of the assignee to. replace the cutter-knives is not because they are of perishable materials, but because the inventor of the machine has so arranged them as a part of its combination, that the machine could not be continued in use without a succession of knives at short intervals. Unless they were replaced, the invention would have been but of little use to the inventor or to others. The other constituent parts of this invention, though liable to be worn out, are not made with reference to any use of them which will require them to be replaced. These, without having a definite duration, are contemplated by the inventor to last so long as the materials of which they are formed can hold together in use in such a combination. No replacement of them at intermediate intervals is meant or is necessary. They may be repaired as the use may require. With such intentions, they are put into the structure. So it is understood by a purchaser, and beyond the duration of them a purchaser of the machine has not a longer use. But if another constituent part of the combination is meant to be only temporary in the use of the whole, and to be frequently replaced, because it will not last as long as the other parts of the combination, its inventor cannot complain, if he sells the use of his machine, that the purchaser uses it in the way the inventor meant it to be used, and in the only way in which the machine can be used. Such a replacement of temporary parts does not alter the identity of the machine, but preserves it, though there may not be in it every part of its original material."

In Bloomer v. Millinger, 1 Wall., at pages 351, 352, 17 L. Ed. 581, the court said:

"Purchasers of the exclusive privilege of making or vending the patented machine in a specified place, hold a portion of the franchise which the patent confers, and of course the interest which they acquire terminates at the time limited for its continuance by the law which created it, unless it is expressly stipulated to the contrary. But the purchaser of the implement or machine, for the purpose of using it in the ordinary pursuits of life, stands on different ground. Such certainly were the views of this court in the case of Bloomer v. McQuewan, 14 How. 549 (14 L. Ed. 532), where the whole subject was very fully considered. Attention is drawn to the fact that there was considerable diversity of opinion among the judges in disposing of that case, but the circumstance is entitled to no weight in this case, because the court has since unanimously affirmed the same rule. Chaffee v. Boston Belting Co., 22 How. 223 (16 L. Ed. 240). In the case last mentioned the court say, that when the patented machine rightfully passes from the patentee to the purchaser, or from any other person by him authorized to convey it, the machine is no longer within the limits of the monopoly. By a valid sale and purchase the patented machine becomes the private individual property of the purchaser, and is no longer specially protected by the laws of the United States, but by the laws of the state in which it is situated. Hence it is obvious, say the court, that if a person legally acquires the title to that which is the subject of letters patent, he may continue to use it until it is worn out, or he may repair it or improve upon it as he pleases, in the same manner as if dealing with property of any other kind. Webst. Pat. Cases, 413, note p."

In Chaffee v. Boston Belting Co., 22 How. (U. S.) at page 223, (16 L. Ed. 240), the court said:

"According to the decision of this court in the cases before mentioned, it then passes outside of the monopoly, and is no longer under the peculiar protection granted to patented rights. By a valid sale and purchase, the patented machine becomes the private individual property of the purchaser, and is no longer protected by the laws of the United States, but by the laws of the state in which it is situated. Hence it is obvious, that if a person legally acquires a title to that which is the subject of letters patent, he may continue to use it until it is worn out, or he may repair it or improve upon it, as he pleases, in the same manner as if dealing with property of any other kind."

In Morgan Envelope Co. v. Albany Paper Co., 152 U. S., at page 127, 14 Sup. Ct., at page 628 (38 L. Ed. 500), the court said:

"His claim was for 'a bundle of paper consisting of one or more lengths formed into a continuous band whose internal diameter is greater than the thickness of the paper, substantially as described.' The invention in question, as described in the specification and illustrated in the drawings annexed to the patent, is for a band of paper rolled in an oval instead of the usual cylindrical shape, with a view of affording a convenient method of tearing off sheets of a proper size, the fracture in each case being at the end of the roll."

And at page 435 of 152 U. S., page 631 of 14 Sup. Ct. (38 L. Ed. 500):

"The true distinction is stated by Mr. Justice Clifford in Aiken v. Manchester Print Works, 2 Cliff. 435 (Fed. Cas. No. 113), where the invention was of a knitting-machine, with which the vendor was accustomed to send a package of the needles used in the machine, which needles were the subject of a separate patent. It was held that the purchase of the knitting-machine and the needles accompanying the same, did not confer upon the purchaser any right, after the needles were worn out and became useless to manufacture other needles, and use the same in the knitting-machine so sold and purchased. The case of Wilson v. Simpson was distinguished from this in the fact that the cutters and knives in that case were not subject to a patent, and of course the respondent had a right to use them as materials to repair his machine; 'but,' says the court, 'unfortunately for the defendants in this case, the needle is subject to a patent, and in making and using it they have infringed the right of the plaintiff.' As we have already held that the paper roll in this case was not the subject of a valid patent, it follows that the defendants cannot be held as infringers for the manufacture and sale of such roll."

In that case a bundle of paper was an element. It was held that there was no infringement in selling the fixture or apparatus bought of the patentee with paper thereon manufactured by the seller thereof. The combination of the paper roll and the mechanism for delivering the paper constituted the invention described in the patent. The court said:

"As we have already held that the paper roll in this case is not the subject of a valid patent, it follows that the defendants cannot be held as infringers for the manufacture and sale of such a roll."

In the case now under consideration the spool with or without the ribbon is not the subject of a patent, or is not patented, and it is not the product of the typewriting machine and hence the cases are not the same. I do not overlook the cotton tie case (Cotton Tie Co. v. Simmons, 106 U. S. 89, 1 Sup. Ct. 52, 27 L. Ed. 79), where the whole ties having served their purpose and having been voluntarily destroyed and discarded by the owner and user were gathered up

and pieced together making new ties like the original. This was a reconstruction of the whole.tie pure and simple. In that case there was also a license restriction giving permission to use the tie once only.

In Davis Electrical Works v. Edison Electric Light Co. et al., 60 Fed. 276, 8 C. C. A. 615, the court held:

"It is reconstruction, and not merely repairing, to make a hole in the bulb of an Edison incandescent electric lamp, (patent No. 223,898), in which the carbon filament has been destroyed by use, and put in a new filament having its ends inserted in platinum sleeves, close the hole by fusing a piece of glass over it, and then exhaust the air. (C. C.) 58 Fed. 878, affirmed."

In that case the claim reads:

"(2) The combination of carbon filaments with a receiver made entirely of glass, and conductors passing through the glass, and from which receiver the air is exhausted, for the purposes set forth."

The court fully considered the question that the filament, one of the elements, was not patented, and, among other things, said:

"The appellants do not bring themselves within the expression in Wilson v. Simpson, 9 How. 125 (13 L. Ed. 66), renewed in substance in Cotton Tie Co. v. Simmons, 106 U. S. 94, and page 52, 1 Sup. Ct. (27 L. Ed. 79), to the effect that temporary parts may be replaced 'in accordance with the intention of the vendor.' While. the Supreme Court has not expressly given this as a limitation, it may be made effectual as a permit where the facts authorize it. In this case the plan of construction, which permits no severance of the parts by any ordinary method of detachment, the sale price of the entire device, about 30 cents, the comparatively large cost of the so-called reparation, the special skill required to make it, the fact proven that the device is made so cheaply that it can be thrown away without substantial loss when the filament is worn out, and the experience that though the patent had run about 13 years, and some 13,000,000 lamps had been made before respondents below commenced the so-called reparations, destruction of the lamp after the filament was worn out had been the rule, distinguish this device in this respect from those which preceded it, exclude the suggestion of either express or implied assent by the patentees to a renewal of the filament, and compel the appellants to meet directly the issue of reparation as against reconstruction."

The filament was one of the main or chief and vital parts of the combination of the patent, and was not an ordinary working part. With its destruction the usefulness of the device was substantially destroyed. Until the film, at comparatively large expense, and with great labor, was replaced, the usefulness of the patented article was absolutely destroyed.. A hole must be made in the bulb, a new filament, having its ends inserted in platinum sleeves, must be inserted, and the hole closed by fusing over it a piece of glass and the air exhausted. This was substantial reconstruction, not merely replacement. It was not like the case now under consideration where the spool, of trifling value as compared with the patented device, may be removed and·replaced by a new one in five seconds, and by merely lifting the old one off and dropping the new one on the spindle ·without disturbing or interfering with any other part of the machine, or with the patented device in question.

In Goodyear Shoe Machinery Co. v. Jackson et al., 112 Fed. 146, 50 C. C. A. 159, 55 L. R. A. 692, the question was whether the

replacement in a patented sewing machine of the cam or pull lever, one of the unpatented elements of the combination, constituted infringement. The court held it did not. The court held:

"The essence of contributory infringement of a patent lies in concerting or planning with others in an unlawful invasion of the patentee's rights, which is usually done by making or selling a part of the patented invention with the intent and purpose of aiding another in its sale or use. Contributory infringement cannot be predicated of the rebuilding or replacing of parts of a patented machine by a purchaser for his own use."

In the opinion it is stated:

"When the patented machine has passed outside the monopoly by a sale and purchase, the patentee has no right to impose any restrictions on its use for his own benefit. He cannot forbid the further use of the machine because it is out of repair in consequence of the wearing out or breaking of some of its parts, and so oblige the purchaser to buy a new machine. The purchased machine has become the individual property of the purchaser, and is like any other piece of property which he owns. He may sell it, or he may use it so long as its usefulness lasts, and then throw it away, or dispose of it for junk. He may prolong its life and usefulness by repairs more or less extensive, so long as its original identity is not lost. He is only prohibited from constructing a substantially new machine. He cannot, under the pretext of repairs, build another machine. * * * When the patent is for a device embracing the combination of several elements, a purchaser will infringe by reconstructing the device after it has fulfilled its purpose and is substantially destroyed. * * * Where the patent is for a machine, which commonly embraces the combination of many constituent elements, the question of infringement by the purchaser will turn upon whether the machine is only partially worn out or partially destroyed, or is entirely worn out, and so beyond repair in a practical sense. * * * The complainant rests its charge of infringement upon the fact that the purchaser, in repairing his machine, replaced, in the feeding device, the cam which, with its connections, gives the vertical movement to the needle. The remaining repairs, so far as they relate to this patent, are admitted to have been immaterial. It is manifest, however, that a broken or wornout cam effected only a partial destruction of the patented combination composed of three separate groups of mechanism, and that the replacement of the old cam with a new one was not a substantial rebuilding of the combination. If the patented invention had been for this particular form of cam, or had been simply for an improved feed, and the whole invention had resided substantially in the cam, the case would have presented a different aspect. * * * There was sold to the purchaser of a Lincoln machine this patented combination, and he had the right to prolong its life and usefulness by any repairs which fell short of a reconstruction of substantially the whole combination. It cannot be said, therefore, that the replacement by the purchaser of the cam or the pull off lever which moves the pull off truck constituted an infringement of the patent, although it may be this cam was the characteristic and most essential element in the combination. The breaking or wearing of this cam resulted in only a partial destruction of the patented combination, and its replacement by a new cam was plainly a restoration, and not a substantial reconstruction of the combination."

This court cannot distinguish that case from the one under consideration. The wearing out of the ribbon and spool, the one going with the other as complainants admit and assert, and which is according to the custom of the trade and manufacturers of typewriters in having them together for convenience, results in only a partial destruction of the combination, one element, not a vital one, and its replacement by an unpatented spool with or without the unpatented ribbon, is "restoration," not a substantial reconstruction of the com-

bination in any respect vitally essential to the patented mechanism. If the spool includes the ribbon so that the "ribbon spool," spool and ribbon, is the element, then the wearing out of the ribbon is a wearing out of the element and it may be replaced by a ribbon on a spool, and this is repair or restoration, and not reconstruction. I take it that it is not necessary that each and every part of the element must be worn out or destroyed in order to permit restoration.

In Shickle, Harrison & Howard Iron Co. v. St. Louis Car-Coupler Co., 77 Fed. 739, 23 C. C. A. 433, the court held:

"A purchaser of a patented machine, consisting of several distinct parts, has a right to repair a part, not separately-patented, which is broken by accident or worn out by use, provided the machine, as a whole, retains its identity, and what is done does not amount to reconstruction; but he has no right under the guise of repairs, to make a new machine. It is no infringement to make and sell, for purposes of repair only, to purchasers from the patentee, the knuckle of the automatic car coupler covered by the Lorraine & Aubin reissue (No. 10,941) and the Wolcott & O'Hara patent (No. 519,216); it appearing that, while this is one of the most important elements of the combination, it is yet peculiarly liable to be broken by shock or strain."

In the case at bar the ribbon necessarily wears out frequently and restoration is demanded. The spool itself will wear out long before the machine by the wear of the holes before described.

In Thomson-Houston Electric Co. v. Kelsey Electric Railway Specialty Co., et al., 75 Fed. 1005, 22 C. C. A. 1, the Circuit Court of Appeals, Second Circuit, held:

"It is not an infringement of the Van Depoele patent, No. 495,443, for an improvement in traveling contacts for electric railways, to furnish to a user of the invention a trolley stand, which is one of the elements of the combination, to replace the original stand, which has become broken, or has otherwise lost its useful capacity. * * * One who purchases the apparatus covered by the Van Depoele patent, No. 495,443, for an improvement in traveling contacts for electric railways, has the right, immediately thereafter, to discard the element known as the 'trolley stand,' and purchase from another a different stand, which he conceives to be better suited to his purposes."

In the opinion it is said:

"While it is not intended that a trolley stand should be broken, or should lose its useful capacity, either calamity may befall it; and the right to replace the injured part by a new stand, from any person who can supply the article, should be conceded by the owners of the patent. It is not intended to permit the unauthorized substitution of the vital and distinctively new part of an invention in place of one worn out by use, as the substitution of a new filament in an Edison incandescent lamp, or the substitution of a new for an old burner in the Wallace Case, supra; but the trolley stand is not the vital element of the invention, though a portion of it is an element of the combination. It is the means, and in most cases the nonpatented means, for there are numerous forms of these bases by which the pole is permitted to perform its functions."

In Morrin v. Robert White Engineering Works (C. C.) 138 Fed. 68, Judge Thomas went carefully over most if not all the cases bearing on the question and stated among other things, that:

"An element of a patented combination may be replaced by the purchaser, of his own authority (1) when its consumption was the very purpose of the device; (2) when its use upon external objects must work its early destruction; (3) when it was intended to be destroyed and was destroyed after a

single use, and became waste material; (4) when, in the arrangement of an element, not the chief element, it is so fashioned and placed as to be specially subjected to external forces that make it peculiarly liable to breakage and wear, like the knuckle in the car coupler; (5) when it is not the chief part of the combination, like the trolley stand; (6) when it is an ordinary working part, like the cam in actuating machinery, although specially adapted for the proper operation of the device, and the decision is broad enough to cover a cam which is the most essential element in a combination. But a part of a combination may not be replaced by the purchaser when it is the vital element of the combination, in fact. and in regard to patentability, especially when it is not intended to be of short life by the action of external forces thereon."

I quite agree with this statement. In that case the learned court held that it was infringement for the defendant under contracts with the purchasers of the patented device to practically refit them with new tubes of peculiar shape which constituted the vital and patentable element of the structure and one-third of its value. The patent had been in litigation and its validity sustained, the patentability thereof having been held to reside in the said tubes, which were of a loop-like form and having a pear-shaped outline when seen in plan, and each loop having at one side a lobe formed by curves and the planes of the loops in the tubes being set obliquely to the axis of the generating cylinder. These were ordinarily subject to injury only from the action of water. If it be true, as stated in Chaffee v. Boston Belting Co., 22 How. (U. S.) 223, 16 L. Ed. 240, that "if a person legally acquires a title to that which is the subject of letters patent, he may continue to use it until it is worn out, or he may repair it or improve upon it as he pleases in the same manner as if dealing with property of any other kind," and as declared in Wilson v. Simpson, 9 How. (U. S.) 109, 13 L. Ed. 66, "but if another constituent part of the combination is meant to be only temporary in the use of the whole, and to be frequently replaced because it will not last as long as the other parts of the combination, its inventor cannot complain if he sells the use of his machine, that the purchaser uses it in the way the inventor meant it to be used, and in the only way in which the machine can be used; such a replacement of temporary parts does not alter the identity of the machine, but preserves it, though there may not be in it every part of its original material," and as decided in Goodyear Co. v. Jackson, 112 Fed. 146, 50 C. C. A. 159, 55 L. R. A. 692, that the replacement in a patented sewing machine of the unpatented cam or pull lever, and in Thomson-Houston Co. v. Kelsey Co., 75 Fed. 1005, 22 C. C. A. 1, that the replacement of the trolley stand, these being elements of the combinations of the patents in question, do not constitute infringement, how can the replacement of the ribbon spool and ribbon in question here be an infringement of complainants' mechanical patent?

In the patent for the Hammond typewriter of 1880, it is said, "The spools can be readily removed and new ones substituted, saving the labor of unwinding, the ribbon being sold upon such spools to be readily replaced, not soiling the fingers," and in the proceedings in the Patent Office in respect to the Underwood patent the complainant, by his attorney, said "The ribbon spools for such machines are sold sep-

arately with new ribbons thereon. * * * No charge is made
for the ribbon spools sold with the ribbons of the Underwood Ma-
chine." In several typewriting machines the spools are readily
removed. I hold with Judge Thomas that an unpatented element
of a patented combination may be replaced by the purchaser of his
own authority when its use upon external objects must work its early
destruction (and such is this case as to a spool with a ribbon); when
in the arrangement of an element, not the chief element, it is so
fashioned and placed as to be specially subject to external forces that
make it peculiarly liable to breakage or wear; when it is not the
chief part of the combination (and that is this case); when it is
an ordinary working part (and such is this case); and I will add
when it is not a vital element of the combination, or a chief part
of it, and is easily removable and replaced without affecting the
identity of the machine, and it is a natural inference that it was
contemplated by the patentee and purchaser and user that such part
should be removed and replaced from time to time, and the part is
in general use and extensively made and sold by others. Nor is it,
in my judgment, necessary that such part, of general manufacture
and sale by others, should be of the particular size required for the
combination.

If these conclusions are correct there is no infringement in this
case. The validity of the patent will not be considered.

The defendant is entitled to a decree dismissing the bill, with costs.

## On Application for Rehearing.

The complainants file a petition for a rehearing of this case, on the
ground that the court has failed to consider the use by the defendant
of the name Underwood alone on its boxes containing typewriter rib-
bons wound upon typewriter spools, and also on the ground that the
relief sought under the design patent, and under the mechanical
patent, has not received a judicial interpretation in the face of the
proofs presented.

This court fully considered the validity of the design patent, and
held expressly that the design patent set out in the bill of complaint
is invalid. This court adheres to that opinion and decision. This
court did not pass upon the validity of the mechanical patent as that
was unnecessary, but did hold that there had been no infringement
by the defendant of that patent assuming it to be valid. Neither the
ribbon nor the spool upon which it is wound is patented. The two
are not patented in combination. The spool is of trivial cost, and
typewriter ribbons are wound upon spools of this character, and sold
as a convenient method of passing them to the hands of the user.
No charge, as a rule, is made for the spool itself. The purchaser if
possible gets his ribbon wound upon a spool, and then simply places
the spool thus wound in his typewriter and this saves time and the
danger of inking the fingers. The typewriter itself is long-lived,
and wears out scores of ribbons, and some spools. The spools last
longer than the ribbons. The defendant makes typewriter ribbons,
as it has the right to do, and it puts them upon spools, as it has the

right to do.  It makes these spools and ribbons of various sizes, as it has the right to do.  It makes them of a size that can be used in the Underwood typewriting machines, and this court has held that the defendant has a right to do this.  The owner of a typewriting machine frequently needs to purchase in the open market a new ribbon or spool or both for use in his machine, and this court expressly holds that the owner of the machine has the right to purchase any ribbon upon any spool found in the market that will fit his machine, and is not compelled to purchase either a ribbon or spool made by the complainants or either of them.  The ribbon and spool are peculiarly subject to wear, and it was contemplated by the seller of the typewriter that the purchaser should frequently change the ribbon and spool, one or both, and no license restriction is imposed.  The replacing of the ribbon and spool is in the nature of repair, and, as these articles are not patented, the owner of the machine is not confined to the use of those made by the maker and seller of the machine itself.  This case is within the principle expressly declared by the Circuit Court of Appeals, Second Circuit, in Thomson-Houston Electric Co. v. Kelsey Railway Specialty Co. et al., 75 Fed. 1005, 22 C. C. A. 1, and the principle declared by the court in Goodyear Shoe Machinery Co. v. Jackson et al., 112 Fed. 146, 50 C. C. A. 159, 55 L. R. A. 692.  The typewriter ribbon and spool do not constitute a vital element nor a chief part of the patented device alleged to be infringed, but only an ordinary working part, and the use of the typewriter must work its early destruction, as it is especially subject to external forces, and is easily removed and replaced without any way affecting the identity of the machine or patented device, and it is a natural inference that it was contemplated by the patentee and by the purchaser and user of the machine that such part should be removed and replaced from time to time.  The defendant has the right to make the ribbon and spool of a proper size to be used in the Underwood machine, and to sell the same to any purchaser.  The complainants have no monopoly of either the spool or the ribbon or of both.

The complainants also contend that the court should not have considered the transaction between the defendant and Miss Jaeger in relation to the purchase of a typewriter spool and ribbon.  It may be true that that purchase was made after this action was brought, but evidence was given of the sale and it was pressed upon the attention of the court that this showed infringement and showed what the defendant is doing and the necessity for an injunction, and this court considered it proper to consider the fact of this sale inasmuch as it constituted the strongest evidence in the case of infringement.  It is true that one J. A. B. Smith, before the suit was brought, purchased of defendant a ribbon marked "1 Purple C. Underwood."  This ribbon was of the same character described.  This court holds that the defendant had the right to make it and to sell it even if it knew that the purchaser intended to use it in an Underwood typewriting machine.

Returning to the question of the use of the name Underwood by

144 F.—27

the defendant, this court held and holds that there is no evidence in this case sufficient to sustain a finding that the defendant ever used the name Underwood on its boxes containing ribbons and spools, or either of those articles, with intent to palm off on the public or on purchasers any ribbon or spool of its manufacture as an Underwood ribbon or spool, that is, as a ribbon or spool, or as a ribbon and spool, made by Underwood. The only purpose the defendant had in putting the word Underwood on the boxes was to indicate to its salesmen and to the purchasers that the ribbon and spool contained therein were suitable for use in the Underwood machine. There was no fraud intended or effected in the use of this name on the boxes. The boxes containing the ribbons and spools were so plainly marked and distinguished in other ways that the make of the ribbon and spool could not be mistaken, and there is no evidence in this case to sustain a finding that any person ever was deceived or misled, or that any confusion ever resulted.

This court intended to cover every question raised by the proofs and on the argument. It certainly considered them all.

The application for a reargument is denied.